**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SERVICIO MARINA SUPERIOR, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 07-0770-KD-C** |
| | ) | |
| **MATRIX INTERNATIONAL LTD.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

This matter came before the Court for a non-jury trial on October 20, 2008. Upon consideration of the documentary and testimonial evidence presented at trial and all other pertinent portions of the record, the Court makes the following findings of fact and conclusions of law.

**I.**    **Procedural Background**

This action is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, such that this Court has jurisdiction pursuant to 28 U.S.C. § 1333. Plaintiff is Servicio Marina Superior, LLC ("Plaintiff"), a Louisiana corporation which does business as Servicio, Superior Marina International and/or Cashman Equipment Company, and is the Carrier in this case.[1]  (Doc. 1). Defendant Alter Trading Corporation ("Alter") is an Iowa

---

[1]  For the first time, Matrix alleged at trial that Plaintiff is not the proper party to bring this lawsuit because it is not the party named in the Contract of Affreightment. However, Plaintiff's Verified Complaint states: "[t]he plaintiff, Servicio Marina Superior ("Superior") is a corporation organized under the laws of the State of Louisiana, and does business under the name of Superior Marine International." (Doc. 1 at 1). While Matrix addressed this allegation in its Answer, by stating that it is "without knowledge or information sufficient to admit or deny," Matrix did not raise this issue until trial. At trial, Plaintiff's counsel represented to the Court that Cashman and Servicio are affiliated companies with Superior (Cashman handles the barges and Servicio handles the tugboats). Additionally, in the parties' Rule 26(f) Report, Matrix asserted that Servicio was the carrier under the Contract of Affreightment. (Doc. 18 at 1(B)). Further, in the Pretrial Order, Matrix did not raise the Plaintiff's status as a disputed fact. (Doc. 31). Finally, in its trial brief filed on the morning of trial, Matrix did not raise the issue and referenced Servicio as the Plaintiff. (Doc. 45). As such, the record indicates that the parties understood

corporation doing business in Mobile, Alabama, and the garnishee; pursuant to the parties' agreement, Alter was dismissed from this case. (Docs. 1, 33). Defendant Matrix International, Ltd. ("Matrix"), an exporter of scrap metal, is a Cayman Islands corporation doing business in the Cayman Islands, and is the Shipper in this case.[2] (Doc. 1).

On October 29, 2007, Plaintiff initiated this litigation by filing a Verified Complaint against Matrix, with a Request for Attachment as to Alter, pursuant to Supplemental Admiralty Rule B and a Motion for Issuance of Rule B Attachment. (Doc. 1). Plaintiff seeks recovery for damages from Matrix's alleged breach of contract. (Id.) Plaintiff asserts that from August 27, 2007 to September 28, 2007, Plaintiff supplied a tug, barge and other equipment to Matrix, and during this period, transported a cargo of scrap metal from the Cayman Islands to the Alter facility in Mobile, Alabama, pursuant to the contract. (Id.) The claims are based upon Plaintiff's provision of vessels and equipment to Matrix for two voyage contracts, with the first voyage contracted for September 2007 and the second voyage contracted for October 2007.

Plaintiff claims that the following amounts are due and owing from Matrix: 1) $140,557.30 for the September Voyage; 2) $376,234.33 for the October Voyage; 3) $14,447 for equipment charges; and 4) attorneys' fees plus interest. (Plf's Tr. Ex. 9). As such, Plaintiff seeks recovery of the sum of $531,238.63, plus attorneys' fees and interest.[3]

---

that Plaintiff does business as Superior and/or Cashman and that they have been litigating this case for almost a year accordingly, such that Matrix's allegation is unpersuasive and untimely.

[2] Plaintiff alleged that Matrix is a Canadian corporation in its Complaint. (Doc.1). Matrix denied this allegation in its Answer (Doc. 16), and at trial, Bruce Young testified that it is a corporation organized under the laws of the Cayman Islands. Plaintiff then stated in its proposed post-trial pleading, that Matrix is organized under the laws of the Cayman Islands (Doc. 49-2 at ¶ 2).

[3] Plaintiff claims that under the Contract terms, amounts which are owed and which have not been paid, accrue interest at the rate of 1.5% per month from the date due until the amounts are paid in

II.     **Findings of Fact**

At trial, the parties presented, in support of their respective claims, documentary evidence as well as the live testimony of Bruce Young (President of Matrix), John Williston (Cashman's Project Manager and designated representative for Plaintiff), Danny Hudnall (an employee of Cashman in Operations, for Plaintiff) and Durell ("Skip") Broussard (a Construction Superintendent for Cashman, for Plaintiff) and the deposition testimony of Andrew McLaughlin (a former director with Matrix who supervised operations and was offered as Matrix's Rule 30(b)(6) representative (Def's Tr. Ex. 1)) and portions of the deposition testimony of Jerry Jones (Def's Tr. Ex. 2).  The Court sets forth the following as findings of fact in this case, based upon the testimony and evidence submitted at trial.

On March 18, 2007, Matrix was awarded a contract from the Government of the Cayman Islands, under which Matrix agreed to export scrap metal from the Islands to the United States.  In August 2007, Matrix contacted Plaintiff and began negotiations regarding the exportation of scrap metal from the Cayman Islands to the United States.  Several e-mails between Brian Jones (employee of Plaintiff) and Bruce Young (Matrix) reveal that on August 3, 2007 and August 8, 2007, the parties were discussing a potential time charter agreement.  For example, an August 8th e-mail from Brian Jones to Bruce Young (cc'd to others) states, in part, that the lump sum price for the time charter from the Caymans to New Orleans will be $275,000, demurrage will be billed at $15,000/day plus fuel and lube, and any delays caused by re-routing of the voyage may result in

---

full.  (Doc. 1 at ¶ 13).  Moreover, Plaintiff alleges that the Contract provides that the party who substantially prevails in any litigation arising out of the Contract, is entitled to recovery of reasonable legal fees and costs.  (Id. at ¶ 14).  Thus, Plaintiff seeks from Matrix, the amount owed from the September Voyage and the amount owed from the October Voyage together with interest, costs and reasonable attorneys' fees.  (Doc. 1).

additional charges.  (Def's Tr. Ex. 8).  On August 10, 2007, Brian Jones requested, via e-mail (cc'd

to others), from Bruce Young, a copy of the contract between Matrix and the Cayman Islands

Government.  (Def's Tr. Ex. 9).

On August 23, 2007, John Williston ("Mr. Williston"), the Project Manager for Cashman's

(Plaintiff) sent an e-mail to Bruce Young (Matrix), referenced as "Cashman Equipment Rates" for

"Grand Caym[a]n Proposal," which set out the proposal for Matrix's "project in removing scrap

from Grand Caym[a]n."  (Plf's Tr. Ex. 1).  According to the e-mail, Plaintiff's Proposal included the

following terms:

- arrival of barge and tug on 9/17/07;
- the Barge JMC 300 for $5,500/day;
- the Tug for $8,500/day;
- ramps for $700/day;
- $125,000 in costs for outfitting the barge with 10 foot modified fence/bin wall installation to be paid upon the barge's departure from Louisiana;
- all scrap delivered to Alter in Mobile, Alabama or Southern Scrap in New Orleans, Louisiana, will be credited to Cashman's account;
- "all remaining funds after barge days, tug days, fuel, oil, lube, ramps, assist tugs, customs, agents and equipment costs have been tabulated will be for the account of Matrix[;]" and
- "[t]he all day rate equipment will begin charges on the day the barge and tug depart Louisiana."

(Id.)  On August 24, 2007 at 9:58 a.m., Mr. Williston e-mailed Bruce Young and Brian Jones

regarding the "JMC 300 Proposed Logistical Schedule," stating that "after discussions with Brian

[Jones] we can offer[:]" the tug/barge for $15,000/day; departure date of August 28, 2007; arrival

date of September 5, 2007; a list of all equipment to be loaded on the barge will follow up with day

rates for each;Cashman will want all payments for delivered scrap to be to the account of Cashman

and any remaining funds left after all of Cashman incurred costs will be to the account of Matrix;

and Cashman will begin to draft a contract today on this plan of action and forward to him later.

(Def's Tr. Ex. 10).  On this same day, at 10:15 a.m., Vincent Young (Matrix), e-mailed Jerry Jones (employee of Alter) and Brian Jones (employee of Plaintiff) regarding the "Scrap Metal Removal Grand Cayman" project, stating that Matrix agrees to charter a barge with Cashman for a "fixed price of $5,500 US a day and $8,500 plus fuel and lube for a 10,000 tonne barge and tug. Matrix agrees that Cashman Equipment Corp will receive any monies before Alter pays any funds to Matrix.  Cashman's equipment will be paid upon the removal of all scrap metal from its barge to Alter's desired location for unloading. Matrix will guarantee that Alter will pay for all such fees involved to Cashman to ensure that the vessel reaches the location to Alter Trading . . . ."  (Def's Tr. Ex. 4).

At 11:25 a.m. on August 24, 2007, Brian Jones (employee of Plaintiff) e-mailed Bruce Young (Matrix) (and cc'd to others) regarding the "JMC 3004 Proposed Logistical Schedule," stating that:

> the tug and barge were delayed from our additional [sic] load date of [August] 13th do [sic] to Hurricane Dean.  We elected to reroute the original barge the JMC 300 and tug Elsbeth III do [sic] to obvious concerns for crew and equipment.  We will be sending down the JMC 3004 which came available late today and the tug American Patriot.  We will depart with the equipment on [August] 28th which is the earliest we can depart as we have to truck, load and secure the additional equipment to the barge.  I have are [sic] attorneys working on a new contract for this movement. We also will need a letter or promissory note from Jerry Jones [Alter] confirming that payment from the scrap to be delivered to Mobile from the Cayman Islands will be paid jointly to Servicio Marine Service (Cashman) and Matrix as well as I SIMIS invoices will be paid in full prior to the release of funds to Matrix.

(Def's Tr. Ex. 10).

On or about August 27, 2007,[4] Plaintiff and Matrix entered into a Contract of Affreightment

---

[4]  Plaintiff asserts that the parties entered into the Contract or on about April 27, 2000; however, the Contract shows the date of August 27, 2007, with basic freight commencing on August 28, 2007. (Doc. 1 at Ex. A).

("the Contract"),[5] under which Plaintiff agreed to supply a tug, barge and other equipment and services to Matrix for the purpose of enabling Matrix to ship cargos of scrap metal from the Cayman Islands to Alter's facility in Mobile, Alabama.  (Plf's Tr. Ex. 2; Def's Tr. Ex. 3).  Under the terms of the Contract, Matrix agreed to pay Plaintiff a specified daily rate, plus fuel and lube charges, for use of the tug (to be determined) and the barge (JMC 300).  The Contract provides that:

- Matrix is the Shipper and Plaintiff is the Carrier;
- the basic freight rate would be $15,000 per day plus fuel and lube for the barge (JMC 300) and a tug;
- the number of stand-by hours included was "0 HRS;"
- tender will occur at the port/place of the Cayman Islands and the basic freight rate begins on August 28, 2007;
- the cargos of scrap metal will be transported from the Cayman Islands to Alter's location in Mobile, Alabama;
- the freight charges will be paid to Plaintiff immediately upon delivery of cargo to the Alter facility;
- vessels will be tendered to Matrix on or before the mutually agreed delivery date at a dock/berth in the Cayman Islands as designed by Matrix; and
- the vessels shall be returned to Morgan City, at Plaintiff's option, and the day rate shall continue until the vessels have reached Morgan City.

(Id.)  The Contract also specifies that it "constitutes the entire agreement between the parties with respect to matters addressed in this agreement and expressly supersedes all prior and contemporaneous negotiations, communications, understandings and agreements, whether written or oral."  (Id. at ¶ 19).

---

[5]  "An 'affreightment' is a contract with a ship-owner to hire a ship, or part of it, for the carriage of goods, and is generally in the form of either a charter-party or a bill of lading . . . ."  Hale Container Line, Inc. v. Houston Sea Packing Co., Inc., 137 F.3d 1455, 1461 n.5 (11th Cir. 1998) (citation omitted). The parties's Contract referenced COGSA in Paragraph 11's Limitation of Liability: "[i]t is expressly understood and agreed as between Shipper and Carrier that Carrier shall enjoy all of the benefits and protections of the United States Carriage of Goods by Sea Act, as supplemented and amended, but that said statute shall not render invalid any undertakings by or agreements of the parties hereto."  (Plf's Tr. Ex. 2 at ¶ 11).  The Carriage of Goods By Sea Act ("COGSA"), 46 U.S.C.A. § 1300 et seq. enacted in 1936, is a comprehensive statute intended to limit the liability of carriers (shipping companies) engaged in international shipping.  See, e.g., Unimac Co., Inc. v. C.F. Ocean Service, Inc., 43 F.3d 1434, 1436 (11th Cir.1995).  The parties, however, did not present any COGSA arguments in this case.

Also on August 27, 2007, "barge prep work" began for the September Voyage (preparations to "ready the barge" for the voyage). (Plf's Tr. Ex. 5). On this date, Jerry Jones (Alter) e-mailed Vincent Young (Matrix) and Brian Jones (Plaintiff), regarding the "Scrap Metal Removal Grand Cayman" project, stating that the e-mail certified that Matrix had given Alter permission to pay Cashman for freight and barge rental before they receive any monies for the scrap coming from Grand Cayman; Alter will pay Cashman by wire transfer or check after the material has been unloaded and weights confirmed by vessel survey and by truck scale at Alter's facility in Mobile, Alabama; and Alter will only be responsible for the amount of freight up to, but not exceeding, the value of the scrap on the barge at arrival at the dock of Alter's choosing. (Def's Tr. Ex. 4).

On August 28, 2007, the basic freight rate of $15,000/day commenced. On September 4, 2007, the tug and barge left Louisiana (with three pieces of equipment, supplied by Plaintiff and leased to Matrix – a KOBELCO SK480, a KOBELCO SK250 and a CAT 325 BL), and on September 10, 2007 arrived in the Cayman Islands. (Plf's Tr. Ex. 5). On September 17, 2007, after the leased equipment had already arrived in the Cayman Islands, the parties entered into the First Addendum to the Contract ("First Addendum"), under which Matrix agreed to pay Plaintiff a specified daily rate for these pieces of equipment: 1) a KOBELCO SK250LC HYD Excavator (#LL08U0216) for $500/day; 2) a CAT 325BL (#23R0055) for $700/day; and 3) a KOBELCO SK480 HYD Excavator (#YS06U0397) for $1,200/day. (Plf's Tr. Ex. 3).[6] The First Addendum also provides that Matrix will maintain the equipment in good operating condition, the costs of all repairs

---

[6] According to an August 23, 2007 e-mail from John Williston to Bruce Young (Matrix), all day rate equipment charges began on the day the tug and barge left Louisiana. (Plf's Tr. Ex. 1). Mr. Williston testified at trial that it was his understanding of the agreement that the equipment charges would commence when the tug and barge left Louisiana. This contract term, however, was not included in the First Addendum.

will be borne solely by Matrix, and in the event the equipment is rendered not serviceable or otherwise damaged through accidental or negligent damage, the rental shall continue until the equipment is restored to serviceable condition and in as good a condition as existed at the start of the lease period, and Matrix shall indemnify Plaintiff against any loss of equipment and all damage thereto. (Id.)  Matrix's Rule 30(b)(6) representative Mr. McLaughlin, testified via deposition, that the Addendum was executed to comply with the requirements of the Cayman Islands Government (to show that there was a contract in place for the equipment) and that Matrix had not been aware of the equipment charges before that time, was not even sure what equipment would be sent and that Bruce Young was very surprised at the ultimate equipment rates.  (Def's Tr. Ex. 1 at 47-48).

On September 20, 2007, Brian Jones (Plaintiff) wrote a letter "To Whom It May Concern," stating that Plaintiff originally contracted with Matrix to make the first shipment of scrap from the Cayman Islands to Mobile with an estimated load date of August 13, 2007, but the JMC 300 barge and tug Elsbeth III were delayed from the additional load date of August 13th due to Hurricane Dean, and so "elected to reroute" the barge and tug "due to obvious concerns for both crew and equipment."  (Def's Tr. Ex. 5).  Plaintiff informed Matrix that the vessels would return once the hurricane had passed.  However, upon rescheduling for the transport from the Gulf of Mexico for August 28, 2007, another named storm, Felix, passed to the south of the Cayman Islands causing further delays in anticipation of the direction the storm would take.  (Id.)

The vessels departed Morgan City on September 4, 2007, with the barge JMC 300 and the tug Challenger, and arrived at the Cayman Islands on September 10, 2007. In the first part of September 2007, Cashman Representative Danny Hudnall ("Mr. Hudnall") traveled to the Cayman Islands to supervise the loading of the scrap metal for the September voyage, in order to maximize

the amount which could be loaded onto the barge.   Approximately 3,000-3,500 tons of scrap metal were ultimately loaded onto the barge.  However, according to Hudnall, Matrix did not sufficiently compact the scrap metal in order to increase the load onto barge.

On September 28, 2007, the barge was in Theodore, Alabama, for "off-load" from the September Voyage. (Plf's Tr. Ex. 5).  On September 29, 2007, the barge (in Mobile) and two pieces of equipment (in the Cayman Islands) were placed on stand-by for the October Voyage.  (Plf's Tr. Ex. 7). From September 29 to October 9, 2007, barge stand-by charges of $5,000/day were incurred; from October 10 to October 14, 2007, "tow en route Caymans" stand-by charges of $15,000/day were incurred; from October 15 to October 25, 2007, charges of $5,500 for the barge day rate were incurred; and from September 29 to November 9, 2007, charges for two pieces of leased equipment were incurred at the rate of $1,900/day.  (Id.)

On October 2, 2007, Plaintiff and Matrix entered into a Second Addendum to the Contract ("Second Addendum"), through which the parties agreed that Plaintiff would supply the barge JMC 300 as well as the tug Ocean Raider to Matrix, for the transportation of scrap metal as provided in the Contract.  (Plf's Tr. Ex. 4).  The barge would depart Mobile, Alabama en route to the Cayman Islands on October 8, 2007, at the rate of $5,500 per day for the barge and $9,500 for the tug (for a total of $15,000/day), provided that Matrix had produced at least 6,000 tons processed scrap ready to be loaded onto trucks.  (Id.)  The Second Addendum further provided that until departure to the Cayman Islands, the barge will remain on stand-by at the rate of $5,000/day and all fees for customs and cleaning the barge shall be on the account of Matrix.  (Id.)  As such, October 8, 2007 was the scheduled date for departure – if Matrix had produced at least 6,000 tons of processed scrap.  ( Id.) With that date, the vessel was expected to arrive in the Cayman Islands around October 13-15, 2007.

On October 10, 2007 at 9:38 a.m., Mr. Williston e-mailed Bruce Young and Vincent Young (and cc'd Skip Broussard, Brian Jones and Danny Hudnall), regarding the "Cost Sheets for Matrix" and attached a copy of the September 28, 2007 cost sheet in which Mr. Williston stated that the September Voyage through September 28, 2007, cost Matrix $132,658.74, and the October Voyage which started on September 29, 2007, cost Matrix $82,800.  (Def's Tr. Ex. 1 at Ex. 6).  On October 10, 2007 at 3:35 p.m., Vincent Young e-mailed Mr. Williston (and John Mackenzie) regarding the bill, requesting to see the actual bills from all of the people listed on the Cost Sheet, stating that "something doesn't add up in the math . . . and I can't figure out what the problem is."  (Def's Tr. Ex. 1 at 40-41; Ex. 7).  Vincent Young questioned the bill because the Contract had provided for an agreed price of $250,000 plus $15,000/day for the tug/barge stand-by, but the bill was higher than the original quote.  (Id.)

On October 12, 2007, the tug Ocean Raider departed Theodore, Alabama, for the Cayman Islands.  (Plf's Tr. Ex. 7).  The vessel did not leave on October 8, 2007, as originally anticipated, because there was not enough processed scrap metal in the Cayman Islands.  From October 8, 2007 through November 2, 2007, Durell Broussard ("Mr. Broussard"), the Construction Superintendent for Cashman (Plaintiff), was working in the Cayman Islands in order to determine the quantity of scrap metal for shipping to the United States.

On October 15, 2007, the tug Ocean Raider encountered problems from inclement weather and/or mechanical issues.  Mr. Hudnall (Plaintiff) telephoned Matrix to give notice that Plaintiff was "cancelling" the Contract, and the tug was taken "off hire" at that time.  The tug Ocean Raider was re-routed back to Louisiana on October 15, 2007.  (Plf's Tr. Ex. 7).  According to Mr. McLaughlin (Matrix), Plaintiff told them that the barge had "broke down and they turned it around[,]" but he

10

explained further that:

> We wanted the barge to come back. When they said they had turned the equipment around, we explained that can't work. We are going to have to seek alternate transportation. We can't miss this shipping window. Alter is ready. Cayman Islands Government is on our back. And we are sitting here with metal ready to move. We have got to go.
>
> The understanding with Mr. Brian Jones – and I called him personally – was that second voyage was to be deferred, not canceled . . . . I explained that we would use that tug again at a later time to fulfill our second journey, but we could not use it this time. Because if we waited for the tug, we would certainly not have a company when it arrived.
>
> That's how serious the situation with the Cayman Islands Government was . . . the contract was canceled anyway because of this whole debauchery.

(Def's Tr. Ex. 1 at 52-53).  Mr. McLaughlin added that "[a]s soon as it was determined they [Plaintiff] couldn't make it here in our [Matrix's] time window, it [the scrap metal] certainly was [transported by someone other than Plaintiff]." (Id. at 50).

On October 16 or 17, 2007, Matrix cancelled or "repudiated" the contract with Plaintiff by telephoning to report that it had secured another vessel (the Mostein, a Thomson vessel that was already in the Cayman Islands) for the voyage.  At that time, two pieces of the equipment that Plaintiff had leased to Matrix were still in the Cayman Islands.  (Plf's Tr. Ex. 7).  The Mostein vessel left the Cayman Islands on October 26 or 27, 2007, for the Alter facility in the United States, loaded with approximately 1,300 to 1,500 tons of scrap metal.

The Contract provided that the shipper (Matrix) shall restore the barge at the shipper's (Matrix's) expenses to its condition for the on hire survey-the off hire survey, clean off and repair to be performed at the first U.S. port of call (i.e., the shipper is required to pay for restoring the barge to the condition pre-voyage).  (Plf's Tr. Ex. 2).  On October 25, 2007, the barge JMC 300 "clean off" was completed.  (Plf's Tr. Ex. 7). Also on this date, Mr. Jones (Plaintiff) sent a letter to Bruce Young

11

(Matrix), providing notification that it would be removing the equipment from the Cayman Islands due to Matrix's breach of the Contract.  (Def's Tr. Ex. 1 at Ex. 13).  In this letter, Mr. Jones (Plaintiff) stated that:

> . . . . Matrix has materially breached the contract with SMS [Plaintiff], and as a result, it no longer possesses any right to use this equipment.  Additionally, Matrix has incurred a substantial debt to our Company for the use of this equipment and we are unaware of Matrix's ability to make payment to us for this period of time, or any other past due amounts from the first trip.  We request that you immediately cease the use of our equipment and let us know of your intention to pay the outstanding debts for the equipment rental, the first trip and the costs incurred for the aborted second trip which you have repudiated . . . .

(Id.)  After the cancellation of the October Voyage, Bruce Young (Matrix) continued to have discussions with Brian Jones (Plaintiff) about three or four future barge voyages.

On October 28, 2007, Vincent Young (Matrix) e-mailed Jerry Jones and Mark Shaw (and cc'd Mr. McLaughlin and Mr. McLaughlin's accountant) with a copy of its October 27, 2007 Invoice in the amount of $352,800 for scrap metal.  (Def's Tr. Ex. 1 at Ex. 16).

In late October or early November 2007, Matrix was shut down or "rendered inactive" by the Cayman Islands Government.  (Def's Tr. Ex. 1 at 13).  The two pieces of equipment that Plaintiff leased to Matrix remained in the Cayman Islands through December 17, 2007.  (Plf's Tr. Exs. 7, 8).

## III.   <u>Conclusions</u>[7]

The parties agree that they contracted for the September Voyage which was performed, and that the parties contracted for the October Voyage which was not performed.  The parties dispute the amount owed by Matrix as to the September Voyage.  They also dispute which party breached

---

[7]  The Court has already addressed (and ruled upon) Matrix's contentions with regard to jurisdiction and/or attachment, and as such, no further discussion is merited here.  (Doc. 44).  However, to the extent that certain other legal issues or arguments raised in the parties' post-trial pleadings are not addressed herein, this is because they were not properly raised in the pre-trial order and/or at trial.

the contract for the October Voyage, what constituted the breach, and what damages, if any, are recoverable. Specifically, Plaintiff seeks recovery from Matrix of the sum of **$531,238.63**, as follows: 1) **$140,557.30** for the September Voyage; 2) **$376,234.33** for the October Voyage; 3) **$14,447** for equipment charges; and 4) attorneys' fees, plus interest. (Plf's Tr. Ex. 9).  In response, with regard to the September Voyage, Matrix contends that: 1) it was overcharged; 2) it made full payment of its obligation under the Contract; 3) the equipment supplied by Plaintiff was in a state of disrepair and much of it could not be used yet Plaintiff seeks payment for alleged "use" of the equipment; and 4) Plaintiff breached the Contract because the height of the barge bin walls were not as agreed or represented (and insufficient), which resulted in Matrix being unable to carry the desired quantity of cargo.  As for the October Voyage, Matrix contends that Plaintiff cancelled the voyage, such that no charges other than for the leased equipment should be due, based upon its inability to perform the voyage or to have a barge ready for loading by a "date certain."[8]

A.    **The September Voyage** (Plf's Tr. Exs. 5, 9)

Plaintiff contends that the sum of $140,557.30 is due to be paid from Matrix, for various charges incurred during the September Voyage.  Specifically, for the September Voyage, Plaintiff charged Matrix $772,457.58, comprised of the following:

| | |
|---|---|
| Basic freight from August 27-September 28 | $447,500 |
| Equipment rental from August 27-September 28 | $79,200 |
| Bline Transportation | $2,702.50 |
| Packard Transportation | $983.25 |

---

[8] Matrix also contends that Plaintiff never submitted a proper invoice for the October Voyage, such that the litigation is premature. Testimony presented at trial (Mr. Williston, Mr. Young), however, supports a finding that the parties agreed that Plaintiff's invoices would be sent to Alter, rather than Matrix, and Matrix did not request invoices from Plaintiff.  Additionally, the testimony of Mr. Williston and Mr. Hudnall indicates that Plaintiff sent Matrix costs sheets as well, to keep Matrix up to date.  Bruce Young, Matrix's President, also testified that Alter paid the bills that Plaintiff submitted and made the necessary disbursements, and that he "signed off" on spreadsheets on a daily basis.

| | |
|---|---|
| Equipment Insurance | $12,650 |
| Trucking | $1,200 |
| U.S. Customs - out of country | $2,633.50 |
| U.S. Customs - back into U.S. | $9,559.70 |
| Customs - Cayman Islands | $61,142.23 |
| Fuel for tug | $65,416.40 |
| Barge configuration costs | $39,600 |
| On Off Hire Survey costs | $3,000 |
| Assist Tug Sea Oak | $17,395 |
| Assist Tug Carolyn Anne | $12,375 |
| Mobile Harbor Tug | $12,500 |
| Cargo Insurance | $4,600 |
| | |
| TOTAL | $772,457.58 |

(Plf's Tr. Ex. 5). Due to the scrap value, per Alter, Plaintiff was paid the sum of $631,900.28, leaving a balance due of $140,557.30. (Id.)

Matrix disputes payment of the following charges: the basic freight; equipment rental; barge configuration; tug assists; and cargo insurance. There is no dispute as to the following charges: Bline transportation ($2,702.50); Packard transportation ($983.25); equipment insurance ($12,650); trucking ($1,200); customs ($2,633.50 plus $9,559.70 plus $61,142.43); tug fuel ($65,416.40); and on off hire survey ($3,000). Accordingly, at the outset, Plaintiff is entitled to recover **$159,287.58** from Matrix. The Court now addresses each of the disputed charges.

### 1.   Basic Freight

Plaintiff seeks recovery of the balance of the sum of $447,500 for basic freight charges for the tug and barge from August 27 to September 28, 2007. (Plf's Tr. Ex. 5). The parties agree that the correct ending date for the freight charges is September 28, 2007, but dispute the $5,500 charge for barge prep work on August 27, 2007. Based upon the record, Plaintiff is not entitled to recover the $5,500 charged for the barge on August 27, 2007 because pursuant to the Contract, basic freight

commenced on August 28, 2007 – one day later.[9]  (Plf's Tr. Ex. 2).  As such, Plaintiff's $5,500

charge for August 27, 2007, is disallowed, such that the $447,500 basic freight charges are reduced

to $442,000.

As stated, the Contract provides that basic freight rate for the tug/barge –  in the sum of

$15,000 per day (plus fuel/lube) – commences on August 28, 2007.[10]  It appears that Plaintiff has

only charged Matrix the sum of $5,500/day from August 28-August 31, 2007, rather than the

contracted rate of $15,000/day.  (Plf's Tr. Ex. 5).  Based on the Contract terms, Plaintiff's charges

for August 28, 29, 30 and 31, 2007 should have been at the rate of $15,000/day.  (Plf's Tr. Ex. 2).

Plaintiff charged Matrix that rate from September 1 to September 28, 2007.  (Id.)  There has been

no explanation as to why that same rate was not charged to Matrix from August 28 to August 31,

2007.  Nevertheless, Plaintiff has not sought recovery of that full rate.  As such, the undersigned will

not reach beyond the boundaries of the relief requested to cure what appears to be an error in

Plaintiff's bill.  In light of the foregoing, the total amount due to Plaintiff, and to be paid by Matrix,

for the basic freight charges for the September Voyage, is **$442,000.**

### 2.  Equipment Rental

Matrix disputes Plaintiff's charges for the leasing of three pieces of equipment in the amount

of $79,200 from August 27 to September 28, 2007, at the rate of $2,400/day, for the September

Voyage.  (Plf's Tr. Ex. 5).  The First Addendum to the Contract provides for Plaintiff to lease to

Matrix the following equipment: 1) a KOBELCO SK250LC HYD Excavator (#LL08U0216) for

---

[9]  Plaintiff appears to concede as much in its post-trial pleading.  (Doc. 49-2 at ¶ 18).

[10]  In addition to the Contract, the testimony at trial indicates that for the September Voyage, the barge was charged at the rate of $5,500/day and the tug was charged at the rate of $9,500/day, for a total freight rate in the Contract of $15,000/day.  (Plf's Tr. Ex. 2).

$500/day; 2) a CAT 325BL (#23R0055) for $700/day; and 3) a KOBELCO SK480 HYD Excavator (#YS06U0397) for $1,200/day.  (Plf's Tr. Ex. 3).

The parties agree that the First Addendum is the agreement which governs the terms of the equipment lease between Matrix and Plaintiff.  Matrix contends that the charges for the equipment are due to be reduced because some of the equipment was unusable.  At trial, Matrix asserted that: 1) it was not able to use the KOBELCO SK250LC Excavator because it was not in working order when received (it was used about two and one-half nights before overheating); 2) it was not able to use the CAT 325BL because the main pump went bad a day or so after arriving in the Cayman Islands (it was used one day at the landfill); and 3) it was only able to use the KOBELCO SK480 HYD Excavator for around three weeks because a pierce blade kept breaking.

At the outset, the testimony and evidence at trial reveals that a portion of the charges that Plaintiff presents for these three pieces of leased equipment includes charges incurred from August 27, 2007 to September 3, 2007 (8 days), at the rental rate of $2,400/day, for a total of $19,200. During this time frame, however, the equipment was not en route to, or in, the Cayman Islands. Rather, the equipment did not depart the United States for the Cayman Islands until September 4, 2007.  (Plf's Tr. Ex. 5).  At trial, Matrix asserted, and Plaintiff conceded, that the equipment charges from August 27 to September 3, 2007 (before the equipment departed) are not recoverable.[11]  As such, the sum of $19,200 is due to be subtracted from the $79,200 claimed, such that amount remaining at issue is **$60,000.**

The Court now turns to the rental charges for each specific piece of equipment.  First, regarding the KOBELCO SK250LC HYD Excavator which was leased at a rate of $500/day, based

---

[11]  Plaintiff's post-trial brief reiterates this concession.  (Doc. 49-2 at ¶¶ 8, 19 (citing Plf's Tr. Ex. 1).

16

on the trial testimony (including Bruce Young), the Court finds that the equipment was not in working order upon arrival in the Cayman Islands because it overheated immediately. The deposition testimony of Mr. Mclaughlin (Matrix) also supports this insofar as he testified that it was "useless from the beginning. It broke down two or three times a day." (Def's Tr. Ex. 1 at 49). As such, the rental charges for this piece of equipment from September 4, 2007 (the date that the equipment departed for the Cayman Islands) through September 28, 2007 (the date of the off-load in Theodore, Alabama), are disallowed.[12] (Plf's Tr. Ex. 5). The time frame from September 4th-28th is 25 days, and thus, at the rate of $500/day, the sum of $12,500 is due to be subtracted from the $60,000 sub-total, such that the amount remaining at issue is **$47,500.**

Second, the CAT 325BL was leased to Matrix at the rate of $700/day. The Court finds, based on the testimony at trial (Bruce Young), that the main pump on this equipment was broken upon arrival in the Cayman Islands and thus was not in working order. Accordingly, the charges from September 4, 2007 (the date of departure for the Cayman Islands) to September 28, 2007 (the date of the off-load in Theodore, Alabama) are likewise disallowed.[13] The time frame from September 4th-28th is 25 days, and thus, at the rate of $700/day, the sum of $17,500 is due to be subtracted from the $47,500 sub-total such that the remaining amount at issue is **$30,000.**

Third, concerning the KOBELCO SK480 HYD Excavator, which was leased at the rate of

_____

[12] Trial testimony indicates that this piece of equipment was returned to the United States when the barge left the Cayman Islands.

[13] The Court notes that Matrix appears to confuse the CAT 325BL with the KOBELCO SK480 Excavator, because Matrix asserts in its post-trial brief that Bruce Young testified that he was able to make limited use of the CAT 325BL for three weeks such that 21 days rental should be charged to them. (Doc. 50 at 3). The Court's review of the trial transcript reveals that it was the KOBELCO SK480 Excavator that was the subject of his testimony at trial. Also, while September 28, 2007 is the "off-load" date or "end date" for the September Voyage, and Plaintiff asserts in its post-trial brief that this piece of equipment was returned to the United States when the barge left with the scrap metal cargo, in actuality, it was one of two pieces of equipment which remained in the Islands. (Doc. 49-2 at ¶ 20).

$1,200/day, these charges are allowed.  Based upon the record and testimony at trial (Bruce Young), Matrix does not dispute that it used the KOBELCO SK480 HYD Excavator for approximately three weeks[14] after it arrived in the Cayman Islands, and that it owes some rent for this equipment.  The trial testimony reveals further, that this piece of equipment was used and/or operable and capable of being used through at least September 28, 2007.

The parties dispute whether the charges should begin when the equipment departed Louisiana on September 4, 2007, or when the equipment arrived in the Cayman Islands on September 10, 2007.  The Plaintiff's only evidence regarding the agreed start date is an August 23, 2007 e-mail from John Williston, in which he proposes that the equipment rental day rate will start when the equipment departs Louisiana.  However, there was no evidence presented that this proposal was accepted.  Instead, the only evidence offered on the agreed start date for rental of the equipment was from Bruce Young, who testified that he had an agreement with Brian Jones (employee of Plaintiff) that Matrix would not be charged for the equipment until it was delivered to the Cayman Islands.[15]  As such, the Court finds that the charges for equipment rental day rate for the KOBELCO SK480 HYD Excavator, for September 4 to September 9, 2007, are disallowed.  The time frame from September 4 to 9, 2007, is 6 days, and thus, at the rate of $1,200/day, the sum of $7,200 is due to be subtracted from the $30,000 sub-total such that the remaining amount at issue is **$22,800.**

Further, the Court finds that the equipment rental day rate for the KOBELCO SK480 HYD Excavator began on September 10, 2007.  The time frame from September 10 to September 28, 2007 is 19 days, and thus, at the rate of $1,200/day, the total amount due for the rental charges is **$22,800.**

---

[14] Bruce Young testified that it was two to three weeks but in the post-trial brief, he states that it was three weeks.

[15] Neither the contract or the addendum addresses the equipment rental start date.

### 3.    **Barge Configuration**

At trial, Matrix disputed Plaintiff's charges of $39,600 for the costs of barge configuration. The parties agree that neither the Contract nor the First Addendum contain a term or provision regarding either the cost or the height of the barge bin walls, and that the Contract specifies that it "constitutes the entire agreement between the parties with respect to matters addressed in this agreement and expressly supersedes all prior and contemporaneous negotiations, communications, understandings and agreements, whether written or oral."  (Plf's Tr. Ex. 2 at ¶ 19).  Nevertheless, at trial, Bruce Young (Matrix) testified that he understood that the bin wall configuration on the barge (of bin walls of 10 feet in height) would cost $125,000 and that Matrix was responsible for the cost of modifications; he contends, however, that the bin wall height was insufficient.

Citing an August 23, 2007 e-mail from Mr. Williston, the Project Manager for Cashman (Plaintiff) to Bruce Young (Matrix), Matrix contends that the parties agreed that the bin walls on the barge supplied by Plaintiff would be 10 feet in height, for a configuration cost of $125,000.  The e-mail is entitled "Cashman Equipment Rates" for "Grand Caymen Proposal," and sets out the *proposal* for Matrix's "project in removing scrap from Grand Caymen."  (Plf's Tr. Ex. 1). According to the e-mail, the Proposal included "$125,000 in costs for outfitting the barge with 10 foot modified fence/bin wall configuration to be paid upon the barge's departure from Louisiana." (Id.)  Based upon this e-mail, Matrix contends that Plaintiff breached the Contract because it supplied insufficient bin walls between three and six feet in height (in different areas of the barge) and charged Matrix $39,600 for this barge configuration.  (Pfl's Tr. Ex. 5).  Matrix disputes this entire charge, asserting that the bin walls were not 10 feet in height, as contracted, such that Plaintiff is not entitled to recover any charges for this barge configuration.

The e-mail relied upon by Matrix regarding the bin wall height requirement and cost was merely set out in a *proposal* from Mr. Williston to Bruce Young.  At trial, there was no reliable evidence offered to substantiate an acceptance by Matrix of this *proposal*, or offer.  Rather, four days later, the parties entered into a wholly separate Contract which – according to its own terms (Paragraph 19) – specified <u>all</u> of the details of their agreement.  Neither the Contract nor the First Addendum contain bin wall height requirements or specify the costs for barge configuration relating to bin walls.  As a result, Matrix cannot now contend that Plaintiff's failure to configure the barge with 10 foot bin walls constitutes a breach of their agreement.

Moreover, Paragraph 3 of the Contract between Plaintiff (Carrier) and Matrix (Shipper) provides for "Shipper's Warranties and Performance," including the requirement that Matrix inspect the vessel prior to loading cargoes:

> B.   <u>Inspection</u>.  Shipper [Matrix] shall be responsible for inspecting the Vessels, including their fittings, gear and equipment, prior to acceptance at tender to determine their suitability and fitness for the intended services, with Shipper [Matrix] to note any deficiencies in writing to Carrier prior to the commencement of loading cargoes.  Upon Shipper's [Matrix's] acceptance of the Vessels or commencement of loading, whichever shall first occur, <u>Shipper [Matrix] shall be deemed to have acknowledged and agreed that the Vessels, including their fittings, gear and equipment, are in all respects suitable and fit for the intended services</u>. (emphasis added)
>
> * * *

(Plf's Tr. Ex. 2).  Likewise, the Contract provides that "[t]he Shipper irrevocably agrees that the on-Hire Survey shall establish conclusively that Shipper has inspected or has caused to be inspected and agrees that the Barge is in a good and seaworthy condition, and in all respects fit for the service intended; and thereafter, Shipper shall not be entitled to make or assert and hereby agrees not to make or assert any claim against Carrier on account of any representation or warranties, expressed or implied, with respect to the condition of the Barge."  (<u>Id.</u>)

20

Accordingly, Matrix, as the Shipper, was solely responsible for inspecting the vessels prior to acceptance, to determine their suitability and fitness for the intended services (including the bin wall height), and to note any deficiencies in writing to the Carrier (Plaintiff) prior to the commencement of loading cargo. Upon Matrix's acceptance of the vessels or the commencement of loading – whichever occurred first – Matrix was "deemed to have acknowledged and agreed" that the vessels including their fittings, gear and equipment, are in all respects "suitable and fit for the intended services." The act of Matrix's acceptance of the vessels or commencement of loading cargo thus bars any breach of contract claim regarding the bin wall height. Matrix presented no evidence at trial indicating that it noted any deficiencies in writing to the Carrier (Plaintiff) prior to either of these events, or that it refused to accept the bin wall height or configuration costs before loading. Indeed, Mr. Hudnall who was in the Cayman Islands supervising the loading of the scrap metal onto the barge, testified that Matrix never complained about the height of the bin walls on the barge. And while Bruce Young testified at trial that he called Brian Jones about the bin wall height, he testified that he accepted the bin wall height because he was under "so much pressure from the Cayman Islands Government to get the scrap metal exported" and so "had no other choice;" however, that does not alter the contractual terms between the parties. Regardless of the reason, the end result is that Matrix accepted the vessel – as configured – and loaded the cargo. Based upon the Contract terms, Matrix relinquished its right to complain about the configuration. Thus, Matrix's claim that Plaintiff breached the Contract by failing to configure the barge to 10 foot bin wall height fails.

As to the cost of the bin walls provided, the Contract states that the "Shipper [Matrix] shall be responsible for all charges associated with loading/stowage/securing/discharging of cargoes . . . ." (Plf's Tr. Ex. 2 at ¶ 1.D.) The configuration of bin walls is a charge associated with the stowage

and securing of the cargo, thus Plaintiff is entitled to recover **$39,600** for the barge configuration costs.[16]

### 4.   Tug Assist Charges

At trial, Bruce Young (Matrix) initially disputed the charges of $17,385 (Sea Oak), $12,375 (Carolyn Anne) and $12,500 (Mobile Harbor Tug) for the assist tugs for the September Voyage. (Plf's Tr. Ex. 5). The Contract provides that Matrix shall be responsible for <u>all</u> of the charges and expenses of the voyage, including customs, dockage, surveys, port charges, assist tugs and other such charges. (Plf's Tr. Ex. 2 at ¶ 1.D.). Matrix provided no basis at trial – whether documentary or testimonial – for the charges being either incorrect or inflated, other than Bruce Young's testimony that in his personal opinion, the charges "just seem a little steep[,]" "a little expensive[]" and "a little high." Moreover, Bruce Young subsequently testified that he would agree to the charges and just "let it go." Further, the Court notes that Matrix appears to have conceded this charge it its post-trial brief, stating that "[n]o serious dispute was presented with respect to . . . assist tugs . . . ." (Docs. 50 at 5, 50-2 at ¶ 15). Regardless, because Bruce Young has provided no basis, whatsoever, for his claim – other than he "just thinks it's too much" – there is no evidence of record supporting a disallowance of these charges. While Plaintiff's charges are not speculative, Matrix's contention that they are incorrect or excessive is, and this singular contention does not undermine the fact that Plaintiff has satisfied its burden of establishing that the charges are recoverable. Thus, the Court finds tug assist charges, totaling **$42,260,** are due and owing to Plaintiff.

---

[16] For these same reasons, Matrix's suggestion that all of charges for the September Voyage should be reduced in half due to the bin wall height, is misplaced. The Court also notes that, interestingly, Matrix appears to concede its dispute with regard to the barge configuration in its post-trial brief, stating that "[n]o serious dispute was presented with respect to . . . barge configuration costs . . ." (Docs. 50 at 5, 50-2 at ¶ 15).

5.    **Cargo Insurance**

Plaintiff seeks to recover from Matrix $4,600 for cargo insurance for the September Voyage. (Plf's Tr. Ex. 5). While not disputed at trial, Matrix contends in its post-trial brief that Plaintiff had no standing to purchase cargo insurance on behalf of Matrix and there was no evidence of any agreement of the parties for the purchase of such insurance. (Docs. 50 at 5-6, 50-2 at ¶ 15). Matrix asserts that it had its own cargo insurance and should not be required to make a duplicate payment. (Id.) The undersigned's review of the trial transcript does not support a finding that Matrix preserved this issue as a disputed item. At trial, Matrix had the opportunity to, but did not, dispute the cargo insurance charges, and as such, cannot now create a new issue through a post-trial pleading. That being said, this Court's review of Paragraph 6.B(1) of the Contract, indicates that Matrix was required to maintain all risk first party cargo insurance upon all cargoes; however, Matrix has not presented any evidence of said insurance to support a claim that it did, in fact, purchase the insurance. Moreover, Plf's Tr. Ex. 5 indicates that for this line item, the cargo insurance fee was charged to Matrix as follows: "Cargo Insurance for Matrix because they did not provide." As such, the record indicates that Plaintiff secured cargo insurance because Matrix failed to do so in accordance with the terms of the Contract. In sum, Matrix has failed to provide any basis, whether through testimony, evidence, or otherwise, that the cargo insurance charge is incorrect or duplicative. As such, the Court finds that it is properly charged to Matrix such that this charge, totaling **$4,600,** is due and owing to Plaintiff.

6.    **Conclusions**

Based on the foregoing, the Court finds that Plaintiff is entitled to recover from Matrix the following amounts, which were in dispute, for costs incurred during the September Voyage:

Basic Freight                    $442,000

| | |
|---|---|
| Equipment Rental | $22,800 |
| Barge Configuration | $39,600 |
| Tug Assist | $42,260 |
| Cargo Insurance | $4,600 |
| SUB-TOTAL | $551,260 |

Thus, the amount recoverable from Matrix for the September Voyage is $159,287.58 (the undisputed

amount) plus $551,260 (the disputed amount), for a total of $710,547.58. Plaintiff has already been

paid the sum of $631,900.28 (Plf's Tr. Ex. 5). Thus, the final amount due and owing from Matrix

for the September Voyage is **$78,647.30**.

**B.** **The October Voyage** (Plf's Tr. Exs. 7, 8, 9)

Plaintiff initially sought to recover from Matrix the sum of **$376,234.33** for costs incurred

during the October Voyage – the voyage which was never completed. (Plf's Tr. Exs. 7, 8, 9).

Plaintiff's charges consist of the following:

| | |
|---|---|
| Basic freight from September 29-November 9, 2007 and Equipment Rental (2 pieces) | $270,300 |
| New set of shears | $5,146.25 |
| Nuts, bolts, lips for shears | $1,846.74 |
| U Drop packing/shipping for shears parts | $1,391.34 |
| Customs - out of U.S. | $2,750 |
| Assist tug | $7,820 |
| Fuel | $41,400 |
| Customs - into U.S. | $2,760 |
| Off Hire | $1,150 |
| Cleaning/repairing Barge | $18,630 |
| ABS surveyor to approve repairs | $750 |
| Ship out costs for rented equipment | $4,000 |
| Magnet/generator | $2,800 |
| Machine | $3,500 |
| Customs out | $1,500 |
| Dock fees Caymans | $1,500 |
| Trucking rented machine | $4,000 |
| Trucking Cashman machine | $3,500 |
| Customs in | $1,500 |

24

TOTAL                                         $376,234.33

In support of their claim, Plaintiffs reference the Contract and the Second Addendum.  (Plf's Tr. Exs. 2, 4).

Matrix contends that it is not responsible for any of the costs incurred by Plaintiff during the October Voyage because it canceled the voyage due to Plaintiff's failure to comply with the parties' agreed-upon vessel arrival date (a "date certain") at the load port.  According to the deposition testimony of Matrix's Rule 30(b)(6) representative, Mr. McLaughlin, as of October 25, 2007, Matrix does not owe Plaintiff any money for the October Voyage because it "never took place."  (Def's Tr. Ex. 1 at 61-62).  Mr. McLaughlin also testified that it was made clear to Plaintiff that the vessel had to be in the Cayman Islands by a date certain because Matrix was concerned that it would lose its contract with the Cayman Islands Government.  (Id. at 79).

Plaintiff counters, asserting that there was no "date certain," and subsequently contends in its post-trial brief, that Matrix is responsible for paying at least **$237,564.33,** for the following costs incurred up to October 15, 2007 (the date the vessels turned back for the United States): 1) the barge stand-by charges from September 29 to October 9, 2007  (11 days at $5,000/day - $55,000) plus the tug/barge freight charges from October 10 to 14, 2007 (5 days at $15,000/day - $75,000) for a total of **$130,000**; 2) the equipment rental charges for the two pieces of equipment[17] which remained in the Cayman Islands from September 29 to November 9, 2007 (42 days at the rate of $1,900/day) for a total of **$79,800**; 3) the charges for the barge cleaning (removing modifications, etc.) for a total of **$18,630**; and 4) the charges for the shear repairs (bottom line new set of shears $5,146.25, bottom line nuts/bolts/tips for shears $1,846.74, U-drop packing/shipping parts $1,391.34 and ABS

---

[17]  At the time of the October Voyage, two pieces of equipment which Plaintiff leased to Matrix, remained in the Islands: the KOBELCO 480 ($1,200/day) and the CAT 325 ($700/day).

Surveyor to approve repairs $750) for a total of **$9,134.33**.  (Doc. 49-2 at 8-10).  The Court finds that based upon the terms of the Contract and the Second Addendum, as well as the testimony and evidence presented at trial, Plaintiff is entitled to recover a majority of these costs from Matrix.

Specifically, on October 2, 2007, Plaintiff and Matrix entered into the Second Addendum to the Contract for the October Voyage, through which the parties agreed that Plaintiff would supply the barge JMC 300 as well as the tug Ocean Raider to Matrix, for the transportation of scrap metal as provided in the Contract.  (Plf's Tr. Ex. 4).  The barge would depart Mobile, Alabama in route to the Cayman Islands on October 8, 2007, at the rate of $5,500 per day for the barge and $9,500 for the tug, *provided that Matrix had produced at least 6,000 tons processed scrap which is ready to be loaded onto trucks*; and until departure to the Cayman Islands, the barge would remain on stand-by rate of $5,000 per day and all fees for customs and cleaning the barge shall be on the account of Matrix.  (Id.)

Trial testimony indicates that with that departure date, the vessel was expected to arrive in the Cayman Islands around October 13-15, 2007.  The vessel did not leave on October 8, 2007, as originally anticipated, because Matrix had not prepared the requisite amount of processed scrap metal in the Cayman Islands, pursuant to the terms of the Contract.  Instead, on October 12, 2007, the tug Ocean Raider departed from Theodore, Alabama, for the Cayman Islands, thus starting the October Voyage.  On October 15, 2007, however, the tug Ocean Raider encountered problems from inclement weather and/or mechanical issues; Mr. Hudnall (Plaintiff) telephoned Matrix (Bruce Young) to provide notice that it was "cancelling" the Contract and the tug was taken "off hire" at that time.

Matrix's Rule 30(b)(6) representative, Mr. McLaughlin, testified in his deposition that "[w]e were given several different stories [about the tug and barge delay], the first story being that the tug

26

had hit the barge and there was damage to the tug. The second story was that the tug actually received bow damage and they were floating under no power in the middle of the ocean. Finally, we were just told that the equipment had been rerouted back to its home base." (Def's Tr. Ex. 1 at 80). Regardless of whether the reason was based on the weather or mechanical problems, the tug Ocean Raider was taken off hire and was re-routed back to Louisiana on October 15, 2007.  (Plf's Tr. Ex. 7).

On October 16 or 17, 2007, Matrix called Plaintiff to purportedly cancel or "repudiate" the contract, reporting that it had secured another vessel (the Mostein, a Thomson vessel that was already in the Cayman Islands) for the voyage.  Mr. McLaughlin (Matrix) testified that he told Skip Broussard, a Cashman representative who was in the Caymans at that time, that "we have to go with another carrier because this time line is not set by us. If we don't make this payment, we won't have money to pay anybody. We'll lose the contract [with the Cayman Islands Government]. It was well understood that we intended to cancel that journey at that time.  Still we talked about the tug coming back to clear the other islands."  (Def's Tr. Ex. 1 at 81).  At that time, the equipment that Plaintiff had leased to Matrix was still in the Cayman Islands.

Bruce Young of Matrix ("Mr. Young") testified that on a prior occasion, Plaintiff had not charged Matrix when a tug traveling to the Cayman Islands had to turn around due to weather, and so accordingly, Matrix did not believe that it would be charged for the October Voyage which was cancelled by Plaintiff on October 15, 2007.  However, trial testimony revealed that on that prior occasion, Plaintiff and Matrix did not have a Contract of Affreightment or Addendum in place.  Mr. Young also testified that he asked Plaintiff when they could expect to have a tug and barge to the Cayman Islands, but never received an answer.  Accordingly, by October 17, 2007, Matrix signed a contract with Thomson to have the Mostein vessel take the scrap metal to the United States.  Mr.

27

Young then notified Plaintiff that he was going to use another vessel.  However, Mr. Young testified that he and Brian Jones still discussed future voyages.

The Court's review of both the Contract and the Second Addendum does not reveal a "date certain" for Plaintiff's delivery of the tug and barge to the Cayman Islands.  The Contract provides that Plaintiff shall deliver the vessels to Matrix on the date and time and at the ports/places identified in the Contract for delivery, "unless reasons beyond Carrier's [Plaintiff's] control prevent or delay the same .. . " (Plf's Tr. Ex. 2 at 2).  The Contract provides for a port/place of delivery as the Cayman Islands.  The Contract, however, does not provide for either a specific delivery date or a delivery time (*i.e*., no "date certain").  The same holds true for the Second Addendum.  The anticipated departure date of October 8, 2007, was clearly contingent on a certain amount of scrap being ready to ship.  The evidence shows that the required scrap quantity was not ready.

Additionally, the Contract provides, in the "Carrier Warranties and Performance" section, that the Plaintiff "shall use due diligence to tender the Vessels to Shipper[,]" and "shall perform transportation services with due dispatch, but makes no warranty as to speeds or arrival/departure times."  (Plf's Tr. Ex. 2 at ¶ 2.A.).  The Contract also states that Plaintiff "may deviate in attempt to save life and/or property at sea" and leave the barge and cargo in "a position reasonably believed to be safe[,]" as well as "select any route, speed and/or towing arrangement believed reasonable." (Plf's Tr. Ex. 2 at ¶2.C.).  Moreover, in the event of danger or "other event occurring after departure on voyage which, in the opinion of the Carrier [Plaintiff] or Master, prevents or may prevent the safe completion of such voyage, the Vessels may call at any port/place and cause cargoes to be discharged and/or stored ashore at Shipper's sole risk and expense.  Carrier [Plaintiff] may substitute reasonably comparable vessel(s) for the Vessel(s) . . . by providing advance notice to Shipper [Matrix]."  (Id.)  The Contract includes a Force Majeure clause as well, which states, in relevant

28

part, that the Carrier shall not be responsible for delay or inability to perform caused by acts of God; perils of the sea; adverse weather conditions; breakdown/defects in the hull, machinery, equipment, hawsers or lines of the vessels not resulting from a lack of due diligence to make the vessels seaworthy at the commencement of the voyage; deviation in attempt to save life or property at sea; and/or "any other cause which is beyond the actual direct control of the Carrier." (Id. at ¶ 9). Further, the Contract provides that the Shipper "shall be responsible for all charges and expenses accruing during loading, stowage, discharge, and any standby at $15,000.00 per day and any other ports of call during both of the outbound and any backhaul voyages, including without limitations, all customs, port, harbor entrance, dockage, wharfage, moorage, pilotage and assist towing charges." (Id. at ¶ 1.D.). Finally, the Contract requires Matrix to pay hire on the barge until it was properly returned to the United States and properly cleaned.

Plaintiff contacted Matrix on October 15, 2007, when the tug Ocean Raider first encountered problems from inclement weather and/or mechanical issues; indeed, Mr. Hudnall (Plaintiff) telephoned Matrix to give notice that it was "cancelling" the Contract and the tug was taken "off hire" at that time. While Mr. McLaughlin (Matrix), testified that the "understanding with Mr. Brian Jones – and I called him personally – was that second voyage was to be deferred, not canceled . . . . I explained that we would use that tug again at a later time to fulfill our second journey, but we could not use it this time[,]" he added that "[a]s soon as it was determined they [Plaintiff] couldn't make it here in our [Matrix's] time window, it [the scrap metal] certainly was [transported by someone other than Plaintiff]." (Def's Tr. Ex. 1 at 50, 52-53). Bruce Young also testified at trial that it was Mr. Hudnall who used the word cancellation when Plaintiff turned the tug back around October 15th such that it was not necessary for Matrix to cancel the Contract. As such, Matrix essentially agrees that Plaintiff cancelled the Contract first, due to safety concerns with the tug

(weather and/or mechanical), and that Matrix was possibly going to use Plaintiff at a later time but was securing another transporter for that Second Voyage. As such, Matrix's subsequent October 16 or 17, 2007 purported "repudiation" of the Contract, is irrelevant, particularly given Bruce Young's concession at trial that it was not necessary for Matrix to cancel the Contract because Plaintiff had already done so. In short, Plaintiff had already canceled the Contract – *which it was specifically entitled to do under the Contract terms* – at Matrix's expense. As a result, Matrix cannot point to a later (purported) repudiation to avoid the charges incurred by Plaintiff during the Second Voyage. Thus, the Court finds as follows with regard to the specific costs claimed by Plaintiff.

### 1.   **Barge/Tug Freight**

Plaintiff seeks to recover from Matrix for the barge stand-by charges from September 29 to October 9, 2007 (11 days at $5,000/day totaling $55,000), plus the tug/barge freight charges from October 10 to 14, 2007 (5 days at $15,000/day totaling $75,000) for a total of **$130,000** for the October Voyage. (Plf's Tr. Exs. 2, 4, 7). Pursuant to the Contract and Second Addendum, the parties agreed to a freight rate of $5,500/day for the barge JMC 300 and $9,500/day for the tug Ocean Raider; that until the date of departure to the Cayman Islands, the stand by charges for the barge would be at the rate of $5,000/day; that all fees for customs and cleaning of the barge would be for the account of Matrix; and that Matrix was required to pay the day rate for the tug/barge until they reach the United States and were properly cleaned (the off hire survey, clean of and repair to be performed at the first U.S. Port of Call). (Plf's Tr. Ex. 2 at 1; Plf's Tr. Ex. 4).

At trial, Matrix (Bruce Young) disputed the charges for the tug and barge, because it was "never proven" to Matrix "that the barge left." However, Bruce Young later testified that he agreed that under the Contract, Matrix was responsible for the charges for the barge and tug from

September 29, 2007, up to the date that they reached the United States (Morgan City, Louisiana). A review of Plaintiff's bill (Plf's Tr. Ex. 7) reveals that Plaintiff did not charge Matrix the day rate for the tug after October 14, 2007 – only the day rate for the barge.  The Contract provides that Matrix was required to pay for the tug/barge until it reached the United States and was properly cleaned.  As such, while Plaintiff did not charge Matrix the full day rate after October 14, 2007 and through October 17, 2007 (the date the vessels reached the United States), it appears that based upon the Contract, it would have been entitled to do so.  Again, however, the Court, will not reach beyond the relief that Plaintiff has requested.  Based upon the testimony and evidence presented at trial, the Court finds that Plaintiff is entitled to recover the stand-by charges for the barge from September 29 to October 9, 2007 ($5,000/day for 11 days - $55,000), because on October 10, 2007 the vessel departed for the Cayman Islands and that is the trigger date for the day rate to take effect; and the tug/barge day rate from October 10 to October 14, 2007 ($15,000/day for 5 days - $75,000).  Thus, Plaintiff is entitled to recover **$130,000** from Matrix for these charges.

   2.   **Equipment Rental**

   Plaintiff seeks to recover from Matrix the cost of the equipment rental for two pieces of equipment, at the rate of $1,900/day, from September 29 to November 9, 2007 (42 days) for a total of $79,800.  (Plf's Tr. Ex. 7).  Plaintiff presented a bill at trial indicating additional equipment rental charges from November 10 to December 17, 2007, totaling $72,200, however Plaintiff also concedes that it neglected to assert a claim for those equipment rental charges for that time period.  (Plf's Tr. Ex. 8).  As such, the only equipment rental charges at issue for the October Voyage are those from September 29 to November 9, 2007.

   For the reasons stated *supra*, the Court finds that only the charges for the use of the KOBELCO 480 are recoverable.  Matrix has conceded that the equipment was capable of being

used, through November 2nd or 3rd, 2007, when Bruce Young received a letter via e-mail from

Plaintiff instructing Matrix to stop using the equipment.  Moreover, because the KOBELCO 480 was

received in working order, pursuant to the First Addendum, Matrix was responsible for its repairs,

maintenance and rental charges even when not in working order:

* * *

> Matrix . . . hereby agrees to . . . at his own expenses maintain the Equipment [i]n
> good operating condition, well greased, oiled, cleaned and repaired and [i]n such
> condition shall return it to Superior . . . .  The cost of all repairs (parts and labor) will
> be borne solely by the Matrix.  In the event the Equipment [i]s rendered not
> serviceable or otherwise damaged through accidental or negligent damage, the rental
> shall continue until the Equipment is restored to serviceable condition, and in as
> good a condition as existed at the start of the lease period.
>
> Matrix shall indemnify Superior against any loss of Equipment and all damage
> thereto.

(Plf's Tr. Ex. 3).

The record also supports a finding that Matrix received an October 25, 2007 letter, via e-

mail, from Plaintiff, on November 3, 2007, which instructed Matrix to immediately stop using the

equipment.  (Def's Tr. Ex. 1 at Ex. 13).  As such, the Court will allow Plaintiff to recover the cost

of the equipment rental for the period of September 29 to November 3, 2007, for 36 days at the rate

of $1,200/day, such that the amount due to be paid by Matrix to Plaintiff for the equipment rental

is **$43,200.**

### 3.   <u>Barge Cleaning</u>

Plaintiff seeks to recover the sum of $18,630 for the barge cleaning for the October Voyage.

At trial, Matrix disputed this charge, stating, through Bruce Young, that it seemed "a little steep."

The Contract provides that Matrix shall be responsible for <u>all</u> charges and expenses of the voyage,

including customs, dockage, surveys, port charges, assist tugs and other such charges.  (Plf's Tr. Ex.

2 at ¶ 1.D.).  Moreover, Bruce Young subsequently testified that he would agree to allow the charges

32

and just "let it go." Further, the Court notes that Matrix appears to have conceded this charge it its post-trial brief, as it is not listed as a disputed charge. (Docs. 50 at 10, 50-2 at 9-10). While Plaintiff's charges are not speculative, Matrix's contention that they are excessive is, and this singular contention does not undermine the fact that Plaintiff has satisfied its burden of establishing that the charges are recoverable. As such, Plaintiff is entitled to recover the sum of **$18,630** from Matrix for the barge cleaning for the October Voyage.

       **4.**    **Shear repairs**

Plaintiff seeks to recover from Matrix the sum of **$9,134.33** incurred for shear repairs (bottom line new set of shears $5,146.25, bottom line nuts/bolts/tips for shears $1,846,74, U-drop packing/shipping parts $1,391.34 and ABS Surveyor to approve repairs $750). The Contract provides that Matrix shall be responsible for <u>all</u> of the charges and expenses of the voyage, including customs, dockage, surveys, port charges, assist tugs and other such charges. (Plf's Tr. Ex. 2 at ¶ 1.D.). The Second Addendum specifically provides that Matrix will be financially responsible for all repairs to the leased equipment: "[t]he cost of all repairs (parts and labor) will be borne solely by . . . Matrix." Similar to the barge cleaning charges, *supra*, Matrix provided no basis at trial – whether documentary or testimonial – for the charges being incorrect. Moreover, the Court notes that Matrix appears to have conceded this charge it its post-trial brief, as it is not listed as a disputed charge. (Docs. 50 at 10, 50-2 at 9-10). Regardless, because the Second Addendum to the Contract requires Matrix to bear the costs of equipment repairs, the Court finds that Plaintiff is entitled to recover from Matrix the sum of **$9,134.33** for shear repairs.

In sum, Plaintiff is entitled to recover the total sum of **$200,964.33** from Matrix, for the costs incurred during the October Voyage ($130,000 for barge/tug charges, $43,200 for equipment rental, $18,630 for barge cleaning and $9,134.33 for shear repairs).

**C.    Equipment Retrieval**

In addition to the amounts sought for the September Voyage and the October Voyage, *supra*, Plaintiff seeks to recover the sum of **$14,447** for the additional costs incurred after November 9, 2007 to retrieve the two pieces of equipment from the Cayman Islands and return them to the United States. (Plf's Tr. Ex. 8). Again, Plaintiffs do not assert a claim for the cost of equipment rental after November 9th, even though the equipment stayed in the Cayman Islands from November 9 to December 17, 2007 (they neglected to assert that $72,200 claim due to oversight); rather, just the costs to retrieve the equipment. The Court finds that based upon the evidence and testimony presented at trial, Plaintiff is entitled to recover this sum from Matrix, particularly as Matrix has conceded recovery of this sum in its post-trial filings. (Doc. 50 at 10). As such, Plaintiff is entitled to recover the sum of **$14,447** from Matrix for the equipment retrieval costs.

**IV.    Conclusion**

Based upon the foregoing, it is hereby **ORDERED, ADJUDGED** and **DECREED** that **JUDGMENT** is entered in favor of Plaintiff and against Matrix as follows: 1) for the September Voyage, the amount due to Plaintiff and to be paid by Matrix, is **$78,647.30**; 2) for the October Voyage, the amount due to Plaintiff and to be paid by Matrix is **$200,964.33;** and 3) for the equipment retrieval, the amount due to Plaintiff and to be paid by Matrix is **$14,447.** Thus, the Court finds that Plaintiff is entitled to recover the total sum of **$294,058.63** from Matrix.

Further, to the extent Plaintiff maintains that it is entitled to recover attorneys' fees plus 1.5% interest in this case, any motion for same must be filed no later than **January 16, 2009,** with the appropriate supporting case law and documentation (including a detailed itemization of any and all

reasonable fees and expenses for which recovery is sought).[18]  Any response by Matrix is due to be

filed no later than **January 30, 2009.**

      **DONE** and **ORDERED** this the 18th day of December 2008.

               /s/ Kristi K. DuBose
               **KRISTI K. DuBOSE**
               **UNITED STATES DISTRICT JUDGE**

---

[18]  Plaintiff seeks an award of attorneys' fees in this case.  "In Alabama, 'attorneys' fees or expenses of litigation are not recoverable as damages, in [the] absence of a contractual or statutory duty, other than a few recognized grounds of equity principles.'"  First Alabama Bank of Montgomery, N.A. v. First State Ins. Co., Inc., 899 F.2d 1045, 1070 (11th Cir. 1990).  See also Smith v. GTE Corp., 236 F.3d 1292, 1305 (11th Cir. 2001); Panola Land Buying Association v. Clark, 844 F.2d 1506, 1510 (11th Cir. 1988); Tolar Construction, LLC v. Kean Electric Co., Inc., 944 So.2d 138, 152 (Ala. 2006).